<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**FILED**

JAMES J. WALDRON, CLERK

[July 6, 2012]

U.S. BANKRUPTCY COURT
CAMDEN, N.J
BY: <u>/s/ Christopher Fowler</u>, Deputy

|  |  |
|---|---|
| IN RE: | : |
|  | : CHAPTER 11 |
| COASTAL BROADCASTING SYSTEMS, INC., | : |
|  | : CASE NO. 11-10596 (GMB) |
| Debtor. | : |
|  | : <u>MEMORANDUM OPINION</u> |

<u>APPEARANCES</u>

Ira R. Deiches, Esquire
Deiches & Ferschmann
25 Wilkins Avenue
Haddonfield, NJ  08033
Counsel for the Debtor

Nona L. Ostrove, Esquire
Law Offices of Nona L. Ostrove, LLC
1020 Laurel Oak Road, Suite 100
Voorhees, NJ  08043
Counsel for Edwin Rosenfeld and Wilbur E. Huf, Jr.

Joseph A. McCormick, Jr., Esquire
Paul Pflumm, Esquire
Law Offices of Joseph A. McCormick, Jr., PA
76 Euclid Avenue, Suite 103
Haddonfield, NJ  08033
Counsel for Robert Maschio, Scott Wahl  and Charles Pessagno

Dean Waldt, Esquire
Mariah Murphy, Esquire
BALLARD SPAHR, LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
Counsel for Sturdy Savings Bank

Jeffrey M. Sponder, Esquire
Office of the United States Trustee
One Newark Center
Newark, NJ  07102

This matter comes before the Court upon consideration of Confirmation of Debtor's Plan of Reorganization. Opposition has been filed by Wilbur E. Huf and Edwin Rosenfeld, as well as the United States Trustee's Office. Confirmation is supported by Sturdy Savings Bank and the Debtor's principals/shareholders. A hearing was held on March 28, 2012. Two witnesses testified and six documents were submitted into evidence. The Court requested further briefing by the parties on a limited set of issues. The Court now makes the following findings of fact and conclusions of law.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and the Standing Order of the United States District Court for the District of New Jersey dated July 23, 1984, referring all bankruptcy cases filed in the district to the bankruptcy courts. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(L). The District of New Jersey is a proper venue pursuant to 28 U.S.C. §§ 1408 and 1409.

## I.     BACKGROUND

On January 9, 2011 Coastal Broadcasting Systems, Inc. (the "Debtor" or "Coastal") filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is in the business of operating FM radio stations servicing the greater Cape May County, New Jersey area. Since December 31, 2008, Robert Maschio ("Maschio") and Scott J. Wahl ("Wahl") have served as Coastal's President and Vice-President respectively. Prior to this time, Coastal was owned and operated by seven shareholders, under the chief leadership of the majority shareholders, Wilbur E. Huf, Jr., ("Huf") and Edwin Rosenfeld ("Rosenfeld" and collectively with Huf, "Huf and Rosenfeld").

On December 31, 2008, as a part of a restructuring/refinancing of Coastal's business, Coastal agreed to redeem shares then held by Huf, Rosenfeld, and three other selling shareholders (the "2008 Restructuring"). Also as part of the 2008 Restructuring, Coastal refinanced its debt with its secured lender, Sturdy Savings Bank (the "Bank"), which had provided term loans to Coastal in the sum of $1,895,795.34 and $395,181.80 respectively (the "Pre-Petition Loans"). To secure its obligation to the Bank under the Pre-Petition Loans, Coastal entered into a security agreement dated December 31, 2008 granting the Bank a security interest in all of Coastal's assets including, but not limited to, Debtor's accounts, equipment, general

intangibles, inventory, FCC broadcast licenses, to the extent permitted by FCC rules and policies, and the proceeds of the foregoing (the "Collateral"). The Bank perfected its interest in the Collateral by filing one or more UCC financing statements with the State of New Jersey.

Also in connection with the 2008 Restructuring, Coastal executed promissory notes dated December 31, 2008 in connection with the sale of stock from Huf and Rosenfeld (the "2008 Promissory Notes"). The 2008 Promissory Notes, to each Huf and Rosenfeld, are in the principal amount of $825,000, payable with interest thereon at the rate of five percent (5%) for the first year, six percent (6%) for the second year, seven percent (7%) for the third year and eight percent (8%) for the last two years. The 2008 Promissory Notes were subordinated to the obligations owed by Coastal to the Bank pursuant to a Subordination and Intercreditor Agreement of even date (the "Subordination Agreement"). In addition to the aforementioned notes, Huf and Rosenfeld also hold notes from Coastal with amounts due as of the Petition Date of $21,987.08 and $32,877.58, respectively.

The Subordination Agreement was made between Huf, Rosenfeld, Wahl, Pessagno, Greg Coffey and Raymond Bradley as creditors (referred to therein as the "Creditors"); Coastal as the borrower (referred to therein as the "Borrower"); Wahl Pessagno and Maschio as guarantors (referred to therein as "Guarantors"); and Sturdy Savings Bank, as the Bank. Pursuant to the express terms of the Subordination Agreement, all of the Creditors' claims against Coastal and their liens on the assets of Coastal were subordinated in all respects to the claims and liens of the Bank against Coastal. While the Creditors' claims were subordinated in all respects, Section 2.2 of the Subordination Agreement provided, *inter alia*, that so long as no event of default had been declared by the Bank, the Creditors were still entitled to "scheduled payments of principal and/or interest pursuant to the terms and conditions of the Subordinated Notes … each without further consent of the Bank." See Debtor's Exhibit D-1.

Section 3 of the Subordination Agreement addresses, *inter alia*, the parties' respective rights in the event of a liquidation, reorganization, receivership or other similar proceeding. There are provisions which require the Creditors to refrain from taking actions with respect to payment from Coastal until the Bank is paid in full, and also provisions that permit the Bank to take certain actions on the Creditors' behalf until the Bank is paid in full. Significantly, in

3

Section 3.2 of the Subordination Agreement, Creditors irrevocably authorized and empowered the Bank, in the event of a reorganization, bankruptcy, or other similar proceeding to:

> Demand, sue for, collect and receive all such payments, dividends and distributions referred to in Section 3.1, give acquittances therefor, file claims, proofs of claim, and take such other actions (**including without limitation, voting the Subordinated Debt**) as it may deem necessary or advisable. **Bank is granted a power of attorney by each Creditor** with full power of substitution to execute and file such documentation and take any other action Bank may deem advisable to accomplish the foregoing, and to protect Bank's interest in the Subordinated Debt and its right of enforcement thereof. Such power being coupled with an interest is irrevocable.

See Exhibit D-1, p. 5 ¶3.2. *emphasis added*.

Coastal alleges that from and after the 2008 Restructuring, Coastal struggled to meet its liabilities, in large part because of the substantial interest payments owed to Huf and Rosenfeld pursuant to the 2008 Restructuring terms. Coastal continued to make the payments to Huf and Rosenfeld in accordance with the Subordinated Notes up and until May 2010, and engaged in other efforts to cut costs and increase revenue. In June of 2010, when Coastal defaulted in its payment obligations to Huf and Rosenfeld, they commenced an action in the Superior Court of New Jersey seeking recovery of over $1.6 million from Coastal. Uncertainty over this litigation and Coastal's financial condition precipitated the Debtor's bankruptcy filing on January 9, 2011.

On September 14, 2011 the Debtor filed a Disclosure Statement and a Plan of Reorganization. Shortly thereafter, on September 15, 2011 the Court entered an Order and Notice on the Disclosure Statement and an adequacy hearing was eventually set for January 25, 2012 after several adjournments. On January 17, 2012 the Debtor filed a First Modified Disclosure Statement (the "Disclosure Statement") and a First Modified Plan of Reorganization (the "Debtor's Plan"). Thereafter, on January 27, 2012 the Debtor filed an Amendment to the Plan and on February 7, 2012 the Debtor filed a Second Amendment to the Plan.

The Debtor's Plan provides for five different classes of claims including: Class I – Sturdy Savings Bank and Ally Financial[1]; Class II – Priority Unsecured Claims under §507(a)(3), (4), (5), (6), and (7); Class III – General Unsecured Claims; Class IV – general unsecured claims of Huf, Rosenfeld, Pessagno, Coffey, Bradley, and Wahl; and Class V – claims of interest holders Maschio and Wahl.  The Plan provides that only Class III, consisting of general unsecured creditors other than Huf and Rosenfeld and the other selling shareholders, is impaired and thus, entitled to vote on the Plan.  Initially, the Plan provided for a pro rata distribution of $25,000 to unsecured creditors with allowed claims to be paid on October 12, 2012 in a single installment.  This amount was subsequently increased to $100,000.00 on or about February 8, 2012.  As set forth more fully below, an escrow account at Sun National Bank in the sum of $100,000 titled "Charles E. Pessagno-Escrow for Coastal Broadcasting Debtor Plan" was established pursuant to a consent order, with the account only becoming available for disbursement in accordance with the Plan upon entry of a final Order confirming the Plan.

Huf and Rosenfeld have filed an Objection to the Debtor's Plan (the "Objection").  The Objection argues, *inter alia*, that their claims are impaired under the terms of the Plan and therefore they should be entitled to vote to accept or reject.  In addition, they argued that the Plan improperly classifies their claims; violates the Absolute Priority Rule; lacks feasibility; fails the "best interest" test; and has not been proposed in good faith.  The UST filed an Objection to the Debtor's Plan based solely upon a lack of demonstrated feasibility.

On December 23, 2011, Huf and Rosenfeld filed a competing plan and disclosure statement (the "Competing Plan").  Shortly thereafter, on December 27, 2011, the Court entered an Order and Notice on the disclosure statement and an adequacy hearing was scheduled for January 25, 2012. On February 1, 2012 the proponents of the Competing Plan filed an Amended Disclosure Statement and Amended Plan of Reorganization.  Again, on February 8, 2012 the proponents of the Competing Plan filed a Second Amended Disclosure Statement and a Second Amended Plan of Reorganization (the "Competing Plan" and "Competing Disclosure Statement").

---

[1] Ally Financial provided financing for the Debtor to obtain a 2008 Chevrolet Trailblazer.  Ally Financial will retain its lien on the vehicle under the terms of the Debtor's Plan and payments will be made in accordance with the original terms and conditions of the original loan, with funds generated by Coastal from ordinary operating revenue.

5

At the adequacy hearing held on January 25, 2012, the Court required both the Debtor and the proponents of the Competing Plan to submit amended disclosure statements. On February 8, 2012 the Court entered an order approving the Debtor's Disclosure Statement and on February 10, 2012 the court entered an order approving the Competing Disclosure Statement. The court scheduled a confirmation hearing for both the Debtor's Plan and the Competing Plan on March 28, 2012. On March 23, 2012 the Debtor filed a Certification of Balloting, which indicated that a total of fifteen (15) ballots were received from Class III claimants, and of those fifteen votes cast, fourteen voted to accept Debtor's Plan, representing $186,525.31 of $188,616.95 in claims cast. As noted above, because the Debtor had only considered Class III as impaired, only Class III voted on the Debtor's Plan.

No Certification of Balloting was filed with respect to the Competing Plan and at the March 28, 2012 hearing counsel for the proponents of the Competing Plan indicated that they were not prepared to go forward with confirmation at that time. Therefore, a hearing solely on the Debtor's Plan was held on March 28, 2012 and is the subject of this Memorandum Opinion.

As noted above, the Debtors submitted certain documents into evidence and procured the testimony of two witnesses, Robert Thomas McKinley ("McKinley") and Robert J. Maschio at the confirmation hearing. McKinley is an individual with over forty (40) years in the broadcasting and media services business and is a director at Media Services Group, a broker of media stations in the country. McKinley testified as to the value of Coastal's assets. In McKinley's opinion, the two FM radio stations currently owned and operated by the Debtor are valued at approximately $411,000 and $550,000 respectively. McKinley testified as to the method by which brokers, such as Media Services Group, make such value determinations.

Maschio testified as to the Debtor's current and historical financial condition. Maschio noted that Coastal's payments to the Bank on its outstanding loans remained current and are/were funded from monies generated in the ordinary course of Debtor's operations. Debtor also submitted into evidence the first and second quarter sales reports from 2012, among other documents, which show that Debtor is on pace to meet and/or exceed projections needed to remain current on its obligations to the Bank and remain self-sustaining during Debtor's "off-season" without resort to credit facilities.

On cross-examination by counsel for Huf and Rosenfeld, Maschio was questioned about the terms of the Debtor's Plan, and more specifically, the proposed treatment of the claims of Huf and Rosenfeld. When asked whether the express terms of the Debtor's Plan proposed to "eliminate" the claims of Huf and Rosenfeld, Mr. Maschio replied "[t]hat is correct." See Transcript 3/28/2012 at approximately 2:50:15. Counsel pressed further in asking Mr. Maschio "[h]ow does the Subordination Agreement, in [Mr. Maschio's] understanding, eliminate the debt to [Huf and Rosenfeld]?" Id. Mr. Maschio responded by stating that "[i]t's something we all agreed to…" Id. Maschio's testimony relating to the Plan's proposed treatment of the claims of Huf and Rosenfeld made clear that the proposed treatment thereunder is to extinguish any and all rights Huf and Rosenfeld would otherwise have enjoyed under the terms of the Subordination Agreement.

After the Debtor finished presenting evidence and testimony in support of confirmation of the Debtor's Plan, and after counsel for Huf and Rosenfeld had the opportunity to cross-examine the witnesses, the parties were asked to address the legal issues presented and yet unresolved in the Debtor's Plan.

## II. DISCUSSION

As noted above, Huf and Rosenfeld have filed a lengthy objection to the Debtor's Plan. With respect to the classification objection, this Court has already ruled that the classification of the creditors' claims in the Debtor's Plan is permissible pursuant to the Bankruptcy Code and that said classification is reasonable under Third Circuit case law. Specifically, at the March 28, 2012 hearing the Court found that although the claimants in Class IV may hold unsecured claims and are not being treated similarly to those general unsecured creditors in Class III, their separate classification is reasonable in light of the nature of their claim. This Court found that the Debtor's Plan had not separately classified their interest for the sole purpose of creating an impaired class; rather, their claims were separately classified for a legitimate and reasonable purpose.

Having already concluded that the Debtor's Plan has properly classified the claims of Huf and Rosenfeld, this Court will address more fully below the issue of impairment of Class IV claims under the terms of the Debtor's Plan. As explained more fully herein, this Court

7

ultimately concludes that Class IV claims are impaired under the terms of the Debtor's Plan and therefore they would be entitled to vote, either to accept or reject the Debtor's Plan.  Despite the conclusion that Huf and Rosenfeld would otherwise be entitled to vote on the Debtor's Plan, the assignment of voting rights provision contained in the Subordination Agreement, coupled with the Bank's assertion that it supports Debtor's Plan and would vote on Huf & Rosenfeld's behalf in favor of Debtor's Plan, renders the remainder of the objections asserted by Huf and Rosenfeld under 11 U.S.C. §1129(b) moot.   The Court must then analyze and determine whether the Plan satisfies the applicable confirmation requirements under 11 U.S.C. §1129(a).

    A.    **Impairment of Class IV Claimants**

Huf and Rosenfeld argue that the Debtor's Plan improperly characterizes their Class IV Claims as unimpaired.  This Court agrees.

Any alteration of a creditor's legal rights or privileges constitutes impairment. See In re Club Associates, 107 B.R. 385 (Bankr. N.D. Ga. 1989), *aff'd*, 956 F.2d 1065 (11th Cir. 1992). A claim is not impaired by a reorganization plan unless the claim is classified and treated in a manner inconsistent with its pre-petition rights. Generally, impairment exists when the plan alters rights to which the creditor or interest holder is entitled in some way, even slightly. See, *e.g.*, In re Valley Park Group, Inc., 96 B.R. 16 (Bankr. N.D.N.Y. 1989); In re Lakeside Global II, Ltd., 116 B.R. 499 (Bankr. S.D. Tex. 1989). Any alteration of rights constitutes impairment, even if such alteration enhances or has no impact on the value of the claims. See In re Boston Post Road Ltd. Partnership, 154 B.R. 617 (Bankr. D. Conn. 1993), *aff'd*, 21 F. 3d 477 (2nd Cir. 1994); In re L&J Anaheim Associates, 995 F.2d 940 (9th Cir. 1993)

Here, the Debtor's Plan clearly alters rights to which the creditors, Huf and Rosenfeld, would have otherwise been entitled to exercise.  The terms of the Debtor's Plan provide that "[n]o payments shall be made to the holders of Class IV subordinated claims **by operation of the express terms of the subordination agreements controlling those claims** and the prohibition against payment on account of such claims." See Plan, **emphasis added**.  As noted above, Maschio's testimony at the Confirmation Hearing makes clear that the Debtor's Plan proposes to totally extinguish any and all rights Huf and Rosenfeld would otherwise have enjoyed under the express terms of the Subordination Agreement.  The Debtor takes the position

that such treatment does not affect or otherwise alter their rights under the terms of the Subordination Agreement. The Debtor is incorrect insofar as Huf and Rosenfeld, despite being completely subordinated to the Bank, would still have rights to payment if and when the Bank was ever paid in full. As noted above, the express terms of the Subordination Agreement provide at Section 2.1 that:

> Each Creditor agrees that, except as otherwise provided in Section 2.2 below, all of the Senior Debt shall be paid in full … before Creditors shall be paid anything … on account of the principal of or interest on any Subordinated Debt or any other sums payable in connection therewith…

Section 2.2 goes on to provide that

> scheduled payments of principal and/or interest pursuant to the terms and conditions of the Subordinated Notes may be made by the Borrower and accepted by the Creditors, each without further consent of the Bank, and Borrower's failure to so pay upon Creditors' demand shall entitle such Creditor to demand and accelerate the Subordinated Debt, institute any court proceedings against Borrower and/or any guarantor and/or any Scheduled Subordinated Debt Collateral … to collect any Subordinated Debt and exercise any right or remedy against Borrower, Borrower's assets, any guarantor or such guarantor's assets.

See Exhibit D-1, pg. 3, ¶¶ 2.1 and 2.2. Thus, the express terms of the Subordination Agreement entitle Huf and Rosenfeld to ongoing payments in accordance with the Subordinated Notes and the right to institute legal proceedings against Coastal or a guarantor in the event of non-payment. Huf and Rosenfeld also retain the right, under the express terms of the agreement, to payment on the subordinated debt after payment in full of the Bank's senior debt. Debtor's Plan proposes to totally extinguish not only Huf and Rosenfeld's right to any scheduled payment of principal and/or interest in accordance with the Subordinated Notes, but also any right Huf and Rosenfeld might have to payment, once the Bank is paid in full. Clearly, the rights of Class IV claimants are altered and/or impaired and thus, they should be entitled to vote to accept or reject the Plan in this case.

     Having concluded that the claims Huf and Rosenfeld, along with the other Creditors under the Subordination Agreement, are properly classified, and; having concluded that Class IV claimants are indeed impaired, the next issue this Court will address is whether the Bank,

9

pursuant to the assignment of voting rights provision in the Subordination Agreement, is entitled to vote the claims of Huf and Rosenfeld.

### B. Assignment of Voting Rights

It should be noted that neither the Debtor, the Bank, nor Huf and Rosenfeld addressed the voting assignment provision in the Subordination Agreement prior to the Confirmation Hearing. At the hearing, after Debtor presented evidence and the testimony of its witnesses in support of confirmation, the Court requested that the parties address the voting assignment provision. The Court pointed out that said provision would likely be at issue if the Court were to find that Class IV claimants were impaired and thus entitled to vote. The parties requested additional time to brief the relevant provision of the Subordination Agreement and its applicability/enforceability in this case, and the Court granted said requests. Each party submitted brief memoranda regarding the assignment of voting rights provision, with Huf and Rosenfeld principally arguing that Section 3.2, which contains the assignment language, is only applicable in instances of liquidation of Debtor's assets, and not reorganization. The Debtor and the Bank filed letter briefs arguing that there was no ambiguity in the Subordination Agreement and that Section 3.2, which contains the voting assignment provision, clearly applies in the case of either liquidation or reorganization, such as the Debtor's.

Intercreditor agreements are typically enforced in bankruptcy, pursuant to §510 of the Bankruptcy Code, insofar as they address the payment and priority of payment according to its express terms. Section 510 specifically provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. §510(c). Clauses waiving or transferring various rights of a junior creditor, such as filing a proof of claim or voting on a plan of reorganization, have met with varying responses from bankruptcy courts. The enforceability of voting rights provisions in subordination agreements has been addressed by several bankruptcy courts, with varying results, and has yet to be the subject of a Circuit Court decision. See, e.g., In re Avondale Gateway Center Entitlement, LLC, 2011 U.S.Dist. LEXIS 41450 (D.Ariz. April 11, 2011) (affirming bankruptcy court decision which held that subrogation language contained in Intercreditor agreement authorized first lien lender to vote second lien lender's claim); Blue Ridge Investors II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC), 362 B.R. 43

(Bankr.N.D.Ga. 2006) (upholding voting rights provision as written); In re Curtis Center Ltd. Partnership, 192 B.R. 648 (Bankr.E.D.Pa. 1996) (holding that a junior creditor that willingly contracted away its voting rights must be held to its bargain and the terms of the prepetition agreement were fully enforceable pursuant to §510 of the Code); *but see*, In re S.W. Boston Hotel Venture, LLC, et al, 460 B.R. 38 (Bankr.D.Mass. 2011) (refusing to enforce assignment of voting rights provision of subordination agreement).

As noted above, Section 510(a) provides that a "subordination agreement is enforceable in a [bankruptcy] case … to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. §510(a). It is clear that the phrase "applicable nonbankruptcy law" can refer to either federal or state law and since the construction of private contracts is usually a matter committed to state law, the presumption is that state law will furnish the proper benchmark. In New Jersey, the terms of a subordination agreement are subject to the same principles of contract interpretation as any other contract. See, *e.g*., Gerhart v. Henry Disston & Sons, 290 F.2d 778, 784 (3d Cir. 1961)). An ambiguous contract is one capable of being understood in more sense than one; an agreement obscure in meaning through indefiniteness of expression, or having a double meaning. . . . Before it can be said that no ambiguity exists, it must be concluded that the questioned words or language are capable of [only] one interpretation." Gerhart v. Henry Disston & Sons, 290 F.2d 778, 784 (3d Cir. 1961)). Here, the Court concludes that the terms of the contract are unambiguous.

Section 3.1 and its companion subsection 3.2 are clearly applicable in this case, as the current bankruptcy proceedings are exactly the type referenced therein, and defined in Section 3.1. Specifically, Section 3.1 encompasses the following types of proceedings:

> [u]pon any distribution of any assets of the Borrower… upon or in connection with any dissolution, winding up, sale or liquidation, arrangement or reorganization of Borrower… or upon any assignment for the benefit of creditors or any other marshaling of the assets and/or liabilities of Borrower ….

See Exhibit D-1, pg. 5, ¶3.1. Section 3.2 goes on to state that

> [i]f any proceeding described in Section 3.1 is commenced…Bank is irrevocably authorized … to … file claims, proofs of claim and take such other actions (including without limitation, **voting the Subordinated**

11

>   **Debt**) as it may deem necessary or advisable.  Bank is granted a power of attorney by each Creditor with full power of substitution to execute and file such documentation and take any other action Bank may deem advisable to accomplish the foregoing and to protect Bank's interest in the Subordinated Debt and its right of enforcement thereof.

Id. (**emphasis added**).  It appears from the face of the document that its terms are clear, unambiguous and would clearly be enforceable under applicable non-bankruptcy law.

This Court concludes that the assignment of voting rights provision in the Subordination Agreement is unambiguous and applicable in this case.  Congress's enactment of section 510(a) signaled that the enforcement of subordination provisions was no longer a matter that was committed to the bankruptcy courts' notions of what may, or may not be, equitable; enforcement of such agreements is necessary to prevent junior creditors from receiving windfalls after having explicitly agreed to accept less lucrative payment arrangements. See, Chem Bank N.Y. Trust Co. v. Kheel, 369 F.2d 845 (2d Cir. 1966).  Therefore, this Court finds that the voting assignment provision is enforceable.  Having concluded that Class IV claims of Huf and Rosenfeld are impaired and therefore entitled to vote; and having concluded that the assignment of voting rights provision is enforceable; and the Bank having expressed on the record and in numerous written submissions that it supports Debtor's Plan and, that if Class IV is permitted to vote, it votes in favor of the Debtor's Plan on Huf and Rosenfeld's behalf; this Court is satisfied that the Debtor's Plan has been accepted by all classes of impaired creditors under §1129(a)(8).  Therefore, confirmation of Debtor's Plan will be evaluated under §1129(a).

### C.     11 U.S.C. §1129(a) Confirmation Standards

A plan proponent has the burden of proving by a preponderance of the evidence, that the plan satisfies the 14 applicable requirements for confirmation of a plan as set forth in § 1129(a) of the Bankruptcy Code. See In re Genesis Health Ventures, Inc., 266 B.R. 591, 598-99 (Bankr. D. Del. 2000) (citing In re Gulfstar Indus., Inc., 236 B.R. 75, 77 (M.D. Fla. 1999). This Court has an independent obligation to review the Plan to make sure that it satisfies the requirements for plan confirmation set forth in § 1129. Id. For the following reasons, this Court finds that the Plan satisfies the applicable confirmation requirements including those contested by the objecting parties, Huf and Rosenfeld, and the United States Trustee.

We will address each of the relevant elements of section 1129(a) with respect to the Debtor's Plan. As noted above, this Court concludes that the Debtor Plan satisfies these requirements.

### i. 11 U.S.C. §1129(a)(1)

The first requirement of section 1129(a) is that the plan must comply with "the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). The legislative history reflects that "the applicable provisions of chapter 11 [include sections] such as section 1122 and 1123, governing classification and contents of plan." H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978). See In re G-1 Holdings Inc., 420 B.R. at 216 (D.N.J. 2009) (applicable provisions include section 1122 and 1123). As noted above, this Court has already held that the classification scheme in the Debtor's Plan is not objectionable, and the Court finds that the Plan has complied with the applicable provisions of §1129(a)(1).

### ii. Section 1129(a)(3)

Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The burden to establish good faith is on the plan proponent. In re PPI Enterprises, Inc., 324 F.3d 197, 211 (3d Cir. 2003). The totality of the circumstances must be considered in the course of a "fact-intensive, case-by-case inquiry." 324 F.3d at 211. "'[T]he important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" In re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000) (quoting In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 n. 5 (3d Cir. 1986)).

The focus of the good faith requirement is on the plan itself, and whether the plan achieves a reorganization objective that is consistent with the Bankruptcy Code. This Court is satisfied that the Debtor has proposed its Plan in good faith and not by any means forbidden by law. The Plan will fairly achieve a result consistent with the objectives and purposes of the Code, namely to reorganize its affairs and continue operating.

### iii.   Section 1129(a)(7)

Section 1129(a)(7) establishes the following requirements for each class of impaired claims or interests:

> (A) each holder of a claim or interest of such class--
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or
>
> (B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims."

11 U.S.C. § 1129(a)(7)(A). This section is often referred to as the "best interests" test. See In re Resorts Int'l, Inc., 145 B.R. at 477 (citing In re Toy & Sports, 37 B.R. at 150). The best interests test focuses on individual dissenting creditors rather than classes of claims. Id. Pursuant to clause (A)(i), the standard is satisfied with respect to each holder of a claim or interest which has accepted the plan pursuant to § 1126(f). See In re Toy & Sports, 37 B.R. at 150. As to the dissenting creditors or claim holders, the so-called best interests test, incorporated in § 1129(a)(7) must be met to achieve confirmation. In re Toy & Sports, supra, 37 B.R. at 150. Under the best interests test, the Court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated." LaSalle, 526 U.S. at 440; United States v. Reorganized CF&I Fabricators, Inc., 518 U.S. 213, 228, 116 S. Ct. 2106, 135 L. Ed. 2d 506 (1996).

In this case, despite the class acceptance by Class III General Unsecured claimants, there was one non-accepting creditor within that class. Thus, the Debtor must demonstrate that the "best interest" test is satisfied with respect to Class III claimants. Considering the liquidation analysis contained in Section IV.B of the Debtor's Disclosure Statement and other evidence submitted at the Confirmation Hearing, each holder of an impaired claim or interest that has not accepted the Plan will on account of such Claim or interest receive or retain property under the

Plan having a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the effective date. Accordingly, the requirements of § 1129(a)(7) have been satisfied.

### iv.    Section 1129(a)(10)

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). See In re Resorts Int'l, Inc., 145 B.R. at 477 (where four classes of impaired creditors accepted the plan, exclusive of insiders, requirements of § 1129(a)(10) were satisfied). As indicated in the Certification of Balloting and as reflected in the record of the Confirmation Hearing, Class III: General Unsecured Claims is impaired under the Plan and voted to accept the Plan. The acceptance of Class III is exclusive of insiders. The Court has also found that Class IV, by virtue of the affirmative vote of the Bank, has accepted the Debtor's Plan. Accordingly, the Plan complies with § 1129(a)(10).

### v.    Section 1129(a)(11)

Section 1129(a)(11) codifies the feasibility requirement and requires a demonstration by the proponent of the plan that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 "plan 'has a reasonable probability of success,' and is more than a 'visionary scheme[ ].'" In re Wiersma, 227 Fed.Appx. 603, 606 (9th Cir. 2007) (*quoting* In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir. 1986) and In re Pizza of Haw., Inc., 761 F.2d 1374, 1382 (9th Cir.1985)). See also In re Surfango, Inc., No. 09-30972, 2009 Bankr. LEXIS 4172, 2009 WL 5184221, *11 (Bankr. D.N.J. Dec. 18, 2009) (preponderance standard). Stated otherwise, "as a practical matter it requires the court to find that the plan is 'workable' before it may be confirmed." In re Danny Thomas Properties II L.P., 241 F.3d 959, 962 (8th Cir. 2001). This case-by-case analysis requires a relatively low threshold of proof. See In re G-1

15

Holdings Inc., 420 B.R. 216, 267 (D.N.J. 2009) (the "key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed").

This Court finds that the Debtor has satisfied the feasibility requirement embodied in 11 U.S.C. §1129(a)(11) in this case. The Debtor has demonstrated, through the testimony of its principal Robert Maschio, that there is a reasonable probability that the provisions of the Plan can be performed. Furthermore, the Debtor has shown that it has sufficient cash on hand as needed to pay administrative expenses, fees due to the Clerk of the Court and to the United States Trustee, and the sums necessary to make payment to the Bank and make distribution to the unsecured creditor body.

The United States Trustee objected solely on the grounds of feasibility, arguing that according to the Debtor's prior performance, the Debtor was unlikely to have sufficient cash revenue to fund the $100,000 payout to unsecured creditors on October 12, 2012. To ameliorate the United States' Trustee's concern, the Debtor's interest holders, Scott Maschio and Scott Wahl, requested and arranged for the establishment of a deposit to provide security for the Debtor's ability to make the distributions of Class III claims as identified in the Plan. To that end, an escrow account at Sun National Bank in the sum of $100,000 titled "Charles E. Pessagno-Escrow for Coastal Broadcasting Debtor Plan" was established pursuant to a consent order, with the account only becoming available for disbursement in accordance with the Plan upon entry of a final Order confirming the Plan. To the extent the Debtor's operations are insufficient to fund the unsecured creditors' distribution on October 12, 2012, funds from this escrow account will be immediately available for distribution to the unsecured creditors.

The Debtor also produced extensive financial records for the business during the pendency of the case and such records supported the financial projections anticipated by Debtor going forward. The Debtor has produced, to the satisfaction of the Court, evidence sufficient to show that the Debtor has a reasonable probability of success in substantially consummating all terms of the Debtor's Plan. The Court is satisfied that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or the Reorganized Debtor. Accordingly, the requirements of § 1129(a)(11) have been satisfied.

### III.  CONCLUSION

For the reasons set forth herein, I conclude that the debtors' plan shall be confirmed in accordance with this Memorandum Opinion. Counsel for the Debtor is directed to submit to the Court a proposed Order confirming the Debtor's Plan of Reorganization.

BY THE COURT:

GLORIA M. BURNS
United States Bankruptcy Judge

Dated:  July 6, 2012